## Bates, et al. v. Meade, et al.

(Decided March 13, 1917.)

### Appeal from Letcher Circuit Court.

1. Bastards—Illegitimate Children—When Legitimated.—Under section 1398 of the statutes, reading, "If a man having had a child

by a woman shall afterwards marry her, such child or its de-
scendants, if recognized by him before or after marriage, shall
be deemed legitimate;" children·born before the marriage of
their father and mother will be legitimated by the marriage and
capable of inheriting from their father if recognized by him, al-
though the marriage may be void.

2. Bastards—Illegitimate Children—Marriage Necessary to Legiti-
mate.—Under section 1398 there must be a marriage solemnized
under the forms and ceremonies of the law in order to legitimate
children born before the marriage.

3. Bastards—Illegitimate Children—Marriage of Father and Mother.
—When a marriage that is ·not incestuous or between a white
person and a negro or mulatto, is solemnized according to the
forms of law, although it may be for other statutory reasons a
void marriage or void because a former undivorced husband or
wife was living, the children born before the marriage, will be
legitimated by section 1398.

4. Bastards—Illegitimate Children—Right of to Inherit from Their
Father.—Children born before marriage but legitimated by the
marriage of their father and mother are entitled to share in
the estate of their father as legitimate children would be.

5. Bastards—Illegitimate Children—Void Marriage.—Section 2098 of
the statutes, reading, "The issue of an illegal or void marriage
shall be legitimate," does not apply to a child begotten and born
before the marriage but does apply if the child was begotten
before, although born after the marriage.

6. Bastards—Illegitimate Children—When Not Legitimated.—The
children of an incestuous marriage, or of a marriage between a
white person and a negro or mulatto, are not legitimated under
section 2098 by the marriage of their father and mother.

7. Dower—Requisites of.—Three things are requisite to the con-
summation of the widow's right of dower; a valid marriage;
seisin of the husband, and his death, and if the widow at the
time of her marriage to her deceased husband had a living hus-
band from whom she had not been divorced, she will not be en-
titled to dower in the second husband's estate.

8. Overruled Case.—Sams v. Sams, 85 Ky. 396, is overruled.

J. M. COOK for appellants.

FELIX G. FIELDS for appellees.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

The question in this case is whether Newton and
Robert Meade are to be treated as the legitimate children
of William D. Meade and as such entitled to a share of
his estate. The solution of this question depends on the
proper construction of section 1398 of the Kentucky Stat-
utes, reading: "If a man having had a child by a woman

shall afterwards marry her, such child or its descendants, if recognized by him before or after marriage, shall be deemed legitimate,'' and the applicability of this statute to the facts of this case.

As shown by the record the facts are these: About 1875 Elizabeth ———————— was married to one Samp Smith, in Letcher county, Kentucky. She and her husband lived together as man and wife for about thirty days, when, without any fault on her part, the husband abandoned her, leaving the neighborhood in which they lived, and has never been heard of from that time to this. What became of him, or where he went, or how long he lived—if now dead—no witness in the case pretends to say. About six years after his departure and abandonment, Mrs. Smith, believing him to be dead, married under the forms and ceremonies of the law William D. Meade, a single man, and lived with him as his wife until his death some fifteen years afterwards.

About two years before her marriage with Meade, Mrs. Smith had by Meade a child whose name is Newton Meade, and a few weeks before her marriage to Meade she had another child by Meade, whose name is Robert Meade. After her marriage to Meade she bore to him three other children, Henry Meade, Riley Meade, and Jane Meade, now Mrs. Hall. Before his marriage to Mrs. Smith, as well as afterwards, and until his death, Meade recognized Newton and Robert as his children, providing for them and treating them as he did the three children born after the marriage.

William D. Meade died intestate about 1895, the owner of a tract of land, and after his death, in a suit for a division of the land, the question arose as to whether Newton and Robert were entitled to share in the land with the other three children. The lower court decided that they were not, and this appeal is prosecuted by the appellants to whom Robert and Newton had sold whatever interest they had in the land of their father.

It will thus be seen that the only question in the case, except a minor one that will later be noticed, is, were Robert and Newton, as children of William D. Meade, begotten and born before his marriage with Mrs. Smith, entitled to share in his estate with the three children born after his marriage with Mrs. Smith?

Putting to one side for the present the question whether Mrs. Smith could lawfully marry Meade at the time she did marry him, and the effect of her former marriage on the legitimacy of these two children born

before the marriage, and looking at the case as if there were no impediment to their marriage, it is of course conceded that if Mrs. Smith, when these children were begotten and born, had been a single woman, her subsequent marriage with Meade, the natural father of these children, would, under section 1398, have legitimated them. But it is insisted that under this section only children begotten and born of an illicit intercourse between a single man and a single woman are legitimated by the subsequent marriage of their father and mother and that the section has no application to a state of case in which either the father or mother was married at the time the children were begotten and born as the result of an illicit intercourse with another man or woman.

If this construction of the statute should be adopted, it would not of course apply to the facts of this case, and the result would be that the common law, which prevails in this state except in cases where it has been modified or abrogated by statutory enactment, would determine the status of these children, and under that law they would remain illegitimate notwithstanding the marriage of their parents. Blackstone's Commentaries, vol. 1, page 455; Kent's Commentaries, vol 2, page 208.

That the purpose of section 1398 was to modify this harsh rule of the common law and legitimate children begotten and born out of lawful wedlock if their father and mother afterward married, is clear, and so the only dispute that can arise is as to its meaning; or, in other words, whether its operation should be limited to a marriage that takes place between persons to whose marriage there is no legal objection, or be construed to embrace a marriage lawfully solemnized although one or the other of the contracting parties was incapable of entering into the engagement on account of the existence of a former marriage. It will be noticed that the section does not declare that the man who is the father of a child born before his marriage with the mother must be a single man, or that the woman who is the mother must be a single woman, before it will be applicable, but it is said that its application should be confined to this class of persons.

Supporting this construction of the statute, reliance is had on the case of Sams v. Sams, 85 Ky. 396. In that case it appears from the opinion that Leroy Sams during the life of his first wife became the father of several children by another woman, whom he married after the death of his first wife. It also appears that Sams before

his second marriage as well as afterwards recognized as his own the children born to the woman who became his second wife. After his death, intestate, these children of his second wife born before her marriage to Sams asserted the right to share in his estate with the children of his first wife. They based their right to inherit upon section 1398 of the statutes, which makes legitimate the children of a man born before his marriage to their mother if recognized by him before or after marriage. But the court, holding that this statute did not make the children of a married man by another woman legitimate, although he may have married their mother after the death of his first wife, said:

"Where the offspring is the result of an illicit intercourse between unmarried people, the legislature saw the necessity of enacting some statute by which the children in a certain state of case might be made legitimate, and, therefore, the law has said to the parties, 'if you will marry, your children shall not be bastardized, but will be under the law your legitimate offspring'; and to say that this law applied to cases where married men were being guilty of adultery, and as an encouragement to them to do better, and to relieve their offspring from the position in which they are placed by the law, would be an absured construction of the statute. . . . .

"The statute was not intended to apply to those who are married, but the language is addressed to those who are single, and are not, at their second marriage, the lawful husband or wife of another. It was not to encourage those who had entered upon the marital relation to forsake their marriage vows, and cohabit with others, in antcipation of a future marriage, with a view of making their offspring legitimate, that this statute was enacted, but to make the illegitimate children, begotten by one unmarried, legitimate upon his marrying the mother.

"Where a marriage is contracted in good faith, under the belief by both parties that the former husband or wife was dead, then the children born of such marriage are made by our statute legitimate. The mistake is made to apply to both parties; but when a married man is living in open adultery with another than his wife, with offspring in existence, the result of the unlawful association, no statute or rule of policy should be adopted by which such children should become legitimate, and inherit with the children of the lawful wife the father's estate, because he happens, after the death of his wife,

to marry his concubine. No such construction should be given the statute before us.

"The statute, if construed to apply to a man who is married at the time he begets the illegitimate children, would also apply in its literal meaning to children begotten of a woman who was, at the time, the lawful wife of another, as well as to an unmarried woman."

And we have no doubt that the lower court, in holding Robert and Newton to be illegitimate children, felt constrained so to do by the opinion in the Sams case, which fully supports the decision of the trial judge; and if this opinion, which was followed in the unreported case of Hall v. Hall, 26 Ky. L. R. 610, is adhered to, the judgment must be affirmed. But, although reluctant to so hold, we are convinced that the court in Sams v. Sams gave to this statute too narrow a construction and one that would defeat what we conceive to be the legislative intent in its adoption, which was to save in all states of case from the stain of bastardy innocent and helpless children born out of lawful wedlock whose father and mother afterwards married.

This statute, or similar ones, are in force in many states and the purpose of their enactment, as declared by the courts, was to rescue the children of an unlawful intercourse from the result of the offending of the father and mother when they manifested their willingness to remove as far as they could the illegitimacy of their children by marriage, and this beneficent purpose should not, we think, be defeated by an illiberal construction of the statute. The legislature of this state at a very early day in its history recognized the wisdom and propriety of changing the harsh common law rule—of once a bastard always a bastard—by statutory enactment, and so in 1796 it was declared in section 19 of a statute that may be found in Littell's Laws, vol. 1, page 557, that "Where a man, having by a woman one or more children, shall afterwards inter-marry with such woman, such child or children, if recognized by him, shall be thereby legitimated. The issue also in marriage deemed null in law, shall, nevertheless, be legitimate." And from that time to this the idea expressed in the act of 1796 has been a part of the statute law of the state, although some verbal changes have been made in the form of the statute, as may be seen by a comparison of section 19 of the act of 1796 and sections 1398 and 2098 of the Kentucky Statutes. The changes, however, did not affect the substantial thing intended to be accomplished by the

original section, which was to legitimate children born out of lawful wedlock if their father and mother afterwards married and the children were recognized as his own by the father.

In speaking of the act of 1796, which was a copy of a Virginia act of 1785, this court, in Jackson v. Moore, 8 Dana 170, said: "By these provident enactments Virginia and Kentucky have adopted a principle of the civil law, in lieu of the harsh and unreasonable rule of the old common law of England.

"It was evidently the object of these legislative provisions to legalize, upon the prescribed conditions, the births of ante-nuptial children, and to make such children, in all respects, as legitimate as they would have been had they been the issue of lawful wedlock? And such, in our opinion, is obviously the constructive effect of those enactments, so far as they apply to children born before a marriage *de facto* of the parents. According to the statutes, the subsequent marriage of the parents, and recognition of any such child by the father, *ipso facto* legitimates the child, who would otherwise be illegitimate."

In Scanlon v. Walshe, 81 Md. 118, 48 Am. St. Rep. 488, the court had under consideration the proper construction and effect of a statute very similar to section 1398, and reading: "If any man shall have a child or children by any woman, whom he shall afterward marry, such child or children, if acknowledged by the man, shall, in virtue of such marriage and acknowledgment, be hereby legitimated and capable in law to inherit and transmit inheritance as if born in wedlock." And in the course of the opinion the court said:

"This section was before this court for construction in the case of Hawbecker v. Hawbecker, 43 Md. 516, where a married man had by his wife four children born in lawful wedlock, and during the life of his wife he also had six children by another woman. His wife died, and he subsequently married the mother of the last-mentioned children, whom he acknowledged as his, and treated them as he did the children of his first wife. It was very earnestly contended in that case that the section above quoted should not be construed so as to include within its terms a case in which children are conceived and born when their parents are under impediment to marry. But it was held that although the legislature, no doubt, in thus mitigating the severe rule of the common law, intended to hold out to the surviving parents an

inducement to marry, and thus put a stop to the further illicit intercourse between them, yet 'the main purpose and intent of the enactment . . . . was to remove the taint and disabilities of bastardy from the unoffending children, whenever their parents did marry, without regard to the deepness of guilt on the part of their parents.' . . . . The legislature has not seen fit to make any exceptions to its operations. Its terms embrace every case where 'any man shall have a child or children by any woman whom he shall afterward marry.' "

In Ives v. McNicoll, 59 Ohio St. 402, 69 Am. St. Rep. 780, the question for decision was whether a child whose father was single, but whose mother was a married woman, although not living with her husband, and whose father and mother after the birth of the child and the divorce of the wife married, was made legitimate under the statute of Ohio, reading: "When a man has by a woman one or more children, and afterwards intermarries with her, such issue if acknowledged by him as his child or children, shall be deemed legitimate; and the issue of parents whose marriage is deemed null in law, shall nevertheless be legitimate." And the court, in holding that the child was legitimated by the marriage, notwithstanding it was begotten and born at a time when the mother was the wife of another man, said:

"The general assembly has the power to enact a law legitimating adulterine bastards, and there would be no absurdity in so doing. Neither would such a statute disturb the general law protecting the marriage relation, nor the law of crimes and misdemeanors, nor the law as to public morals. The subject of marriage and divorce, and the subject of adultery and fornication, and the subject of public morals are all carefully provided for and protected by separate chapters and sections of our statutes. If the general assembly desired to prevent adulterine bastards from becoming legitimated, some provision to that effect would be found in some of the statutes. . . . . After marriage and divorce, and after prosecutions for adultery and fornication, and to protect public morals, there are often adulterine bastards existing whose parents have thereafter become legally married, and have recognized and acknowledged them as their children, and the purpose of our statute is to legitimate such children, and permit them to inherit from the father as well as the mother. Thereby justice is done to the innocent offspring without in any manner imping-

ing upon the law as to the marriage relation or as to public morals.

"Again, it is clear that after the birth of an adulterine bastard, all obstacles being removed, parents may legally marry and enjoy all the rights and privileges of marriage. They may inherit from each other under our statute, and to allow them to marry and enjoy all the fruits thereof and deprive their offspring from inheriting from them would seem rank injustice; and it cannot be presumed, without clear words to that effect, that the legislature intended such an unjust result. To so hold would be to reward the guilty parents and punish the innocent offspring.

"A 'man' means any man, and a 'woman' means any woman. There are no exceptions. If he is a man and she a woman, no matter what their previous lives may have been, they come within the language of the statute, and when legally married and the former issue acknowledged by him as his child, such issue becomes thereby legitimated, even though it is an adulterine bastard."

In Illinois they have a statute substantially similar to section 1398 of our statutes, and in Robinson v. Ruprecht, 191 Ill. 424, the question presented was the legitimacy of children born of an illicit intercourse between a man and a woman, both of whom were married at the time the children were begotten and born, but who afterwards, and when all obstacles to their marriage were removed by the death of the husband of the woman and the wife of the man, married, and the court, in holding that they were legitimate, said:

"We do not see the force of the reasoning that would so restrict the meaning of the section as to exclude from its operation parents, one or the other of whom has violated his or her marriage obligations in the procreation of the child. The child of such parents is not less innocent or unoffending than the child of parents who were unmarried at the time of the copulation, and the ground upon which the insistence is based that a distinction should be made—that the child shall be punished for the sins of the parents—shocks every sense of justice and right. The degree of moral or criminal delinquency of the parents does not enter into consideration in construing the section." To the same effect is Miller v. Pennington, 218 Ill. 220, 1 L. R. A. (N. S.) 773.

In accordance with the trend of these authorities—which reflect the legislative spirit—and many others of a like nature that might be referred to, we are of the

opinion that under section 1398 the children of an unlawful intercourse will be legitimated by the subsequent marriage of their father and mother, although it may appear that at the time the children were begotten and born the mother was the wife of another man and the father the husband of another woman, and of course the same conclusion would necessarily follow if one of the parties was married and the other single. So that looking to section 1398 alone Robert and Newton Meade were legitimated by the marriage of their father and mother and his recognition of them as his children.

But, conceding this, the further objection urged to their legitimacy is that the marriage between Meade and Mrs. Smith at a time when Mrs. Smith was the wife of Samp Smith was null and void, and this being so, Robert and Newton were not legitimated by the marriage, as there was in law no marriage. It is, we think, clear that section 1398 contemplates the marriage according to the forms and ceremonies of the law of the father and mother of the children begotten and born before marriage before the children will be legitimated. If the father and mother never marry, of course, the children can never be legitimated under this section so as to entitle them to inherit from the natural father, as their marriage is by the very words as well as the plain intent of the section necessary to bring it into effect.

Resting on the proposition that the statute contemplates a marriage between parties who at the time are capable in law of entering into that relation, the argument is made that the marriage between Mrs. Smith and Meade was void, or no marriage at all, because she had not been divorced from her first husband and it was not known that he was dead, and consequently Robert and Newton, who were both begotten and born before the marriage, were not legitimated by the marriage, which was a mere nullity.

If this argument were sound, it would at once put an end to the legitimacy of these children, because if the marriage was void, or rather the same as if there had been no marriage, section 1398 of the statutes, before quoted, could have no application, nor would section 2098, providing that ''Issue of an illegal or void marriage shall be legitimate,'' be applicable, as this section does not make legitimate children begotten and born before the illegal or void marriage takes place. It applies only to children who are born after the illegal or

void marriage, although the fact that they were begotten before would not destroy their legitimacy.

A question like this was before the court in Swinney v. Klippert, 20 Ky. L. R. 2014. In that case the court held that under section 2098 a child born after a lawful marriage between his father and mother had been consummated was legitimated, although at the time the child was begotten the father was a married man who obtained a divorce from his first wife and thereafter married the mother of the child born after the second marriage, but begotten before.

The question, therefore, recurs, was the marriage between Meade and Mrs. Smith void in the sense that it was a nullity for all purposes? If it was, Robert and Newton are illegitimate, notwithstanding the subsequent marriage of their father and mother, but if it was not void in this sense, they are legitimate and their status is controlled by section 1398.

It is a general and well settled principle in the law of marriage that if one of the parties is at the time the lawful wife or husband, as the case may be, of another person, the marriage is void as between the contracting parties, and it is so declared to be in this state by section 2097 of the stautes providing that "Marriage is prohibited and declared void . . . . where there is a husband or wife living, from whom the person marrying has not been divorced." But the fact that such a marriage will be void as between the parties to it, or that the guilty one of the contracting parties will have committed the crime of bigamy under section 1216 of the statutes, does not necessarily mean that the children begotten and born before such marriage shall not be legitimated by the marriage or that such children will be denied the right to inherit from their father under the statute of descent and distribution.

That a marriage may be void for some purposes and yet valid for other purposes is clearly shown by section 2098 providing that the children born of a marriage which is void shall nevertheless be legitimate. As between the parties, the marriage may not only be prohibited by law, but where it is bigamous, a crime for which the contracting parties, or that one guilty of bigamy, may be severely punished and yet the children of the prohibited and criminal marriage are by the very words of the statute legitimated. That the Legislature has full authority to make a distinction like this, cannot be doubted when it is considered that the marriage relation

in its legal aspect is wholly a legislative creature subject to such rules and regulations as the legislature may think it wise to adopt, and the legislature in the exercise of its undoubted power has made this distinction for the purpose of saving children from the offending of their parents, while visiting upon the parents the penalty attached to their unlawful act.

The full extent to which the legislature has gone in the effort to save the innocent and punish the guilty may be well illustrated by a comparison of section 1216 of the statutes, reading: "Whoever, being married, the first husband or wife, as the case may be, being alive, shall marry any person, shall be confined in the penitentiary not less than three nor more than nine years, . . . ." with section 2098 of the statutes, reading: "The issue of an illegal or void marriage shall be legitimate, except that the issue of an incestuous marriage, found such by the conviction or judgment of a court, in the lifetime of the parties, or of a marriage between a white person and a negro or mulatto, shall not be legitimate; and where one of the parties is an idiot or lunatic, the issue shall be legitimate as to both."

So that if a man who has a wife living from whom he has not been divorced should marry another woman, he will be guilty of the crime of bigamy and the marriage be void, and yet the children born of such a marriage will be legitimate. In other words, under our statutes the marriage may be void but the children, born after the marriage, will be legitimate, if a marriage was consummated under the forms and ceremonies of the law of the state, subject to the exception in section 2098 that the issue of an incestuous marriage or of a marriage between a white person and a negro or mulatto shall not be legitimate.

This was the construction given to these sections in Harris v. Harris, 85 Ky. 49. In that case the mother, in 1860, married one Smith Ash, from whom she separated, but was not divorced. While she was the lawful wife of Ash she entered into a contract of marriage with Harris, the father of the children, which was consummated with all the forms and solemnities of the law and would have been valid but for the reason that Ash, the husband, was then living and no divorce had been obtained by either of the parties. Harris and his wife lived together as man and wife for eighteen or twenty years, and during this time the children, who it is contended were illegitimate and not entitled to any share in their

father's estate, were born. In discussing the effect of the marriage with Harris, which was held under the statute to be void from its inception and so continued up to the death of Harris, the court, in holding the children to be legitimate, said: "The fact that it was void does not, however, make their children illegitimate—that is, bastardize them so as to make them incapable of inheriting from their parents." The court then, after a reference to section 2098, providing, in part, that "The issue of a void marriage shall be legitimate," said: "Where a marriage actually takes place, that is, when it is solemnized according to the forms of law, although void as between the parties, their offspring will be deemed legitimate, unless they come within the exceptions mentioned: 1. The offspring of an incestuous marriage; 2. The offspring of a marriage between a white person and a negro or mulatto. We find no other exceptions mentioned in the statute."

In Leonard v. Braswell, 99 Ky. 528, the facts were these: Charles Braswell, the father of the children who were claiming their share in their father's estate, married a woman in 1863. Shortly afterwards he deserted her and, without either party getting a divorce, he afterwards, married the woman who was the mother of the children claiming the estate. He lived with his last wife many years and neither she nor any one else knew that he had been previously married, and the court, after approving the rule laid down in Harris v. Harris, *supra,* said that although the marriage was void as between the parties and the husband guilty of the crime of bigamy, the children were nevertheless legitimate.

Turning now to sections 1398 and 2098, it will be seen that they provide for two different states of case— one when the child is born before the marriage takes place; the other when it is the offspring of a void marriage, but in both sections the legislative intent was the same—to save the children from illegitimacy if a marriage was solemnized between the parties, and it was not an incestuous marriage or a marriage between a white person and a negro or mulatto.

If then it be conceded, as it must be under the plain letter of section 2098, that the issue of a void marriage shall be legitimate, we perceive no sound reason why this legitimating principle should not be read into section 1398 so as to make legitimate children of the parties born before the marriage although their marriage was prohibited by law and the offender against the bigamy stat-

ute guilty of a felony. If the issue of a void marriage are legitimate under section 2098, why should not the issue before the marriage be made legitimate under section 1398, although the marriage was void? The same reasons that would save the child of a void marriage from illegitimacy should save the child born before marriage and thus put the child of a void marriage on the same footing with the child born out of marriage, but whose parents subsequently married.

This case furnishes a good illustration why the rule of construction we have set out should be adopted. Here Mrs. Smith and Meade, believing in good faith that the former husband of Mrs. Smith, who had been absent and unheard of for more than five years, was dead, married. They lived together happily, as we may presume, for fifteen years or more and until the death of Meade. The children born and begotten before the marriage were treated on an equality with those born after the marriage, and if it should be assumed that the marriage was void, it would be unreasonable in the extreme, as well as wholly indefensible, to bastardize the children born before the marriage and legitimate those born afterwards. The statute does not require that we should adopt so irrational and illogical a rule, and the plainest dictate of common sense and common justice forbids that it should be adopted.

Supporting this view is Stegall v. Stegall, 2 Brockenbrough's Reports 256, in which Chief Justice Marshall, of the Supreme Court of the United States, sitting as circuit judge, delivered the opinion. In that case a controversy arose between the children of John Stegall by two wives. It appears in the opinion that one set of these children was born of his marriage with his wife Catherine. That during the marriage relation with Catherine, he married Susannah Portwood, by whom he had one child, Elizabeth, before his marriage, and others afterwards. At the time of this trial the Virginia statute heretofore mentioned was in force, and the court held that, although the marriage of Stegall with Susannah Portwood, after his marriage with his wife Catherine, and while she was living, was null and void, nevertheless by the Virginia act the children of Susannah Portwood born before and after his marriage with their mother, and recognized by him after his marriage, were his legitimate children.

Also supporting this view is Carroll v. Carroll, 20 Texas Reports 731, in which it was held that children

begotten and born before the marriage of their father and mother were legitimated under a statute very similar to ours, although it appeared that the father was the husband of another woman and the mother the wife of another man at the time of the marriage.

Our conclusion, therefore, is that when a marriage, that is not incestuous, or between a white person and a negro or mulatto, is solemnized according to the forms of law, although it may be for other statutory reasons a void marriage or void because a former and undivorced husband or wife was living, section 1398 will legitimate the children born before the marriage. This being so, Robert and Newton Meade were legitimated under section 1398 by the marriage of their father and mother, although this marriage may have been void on account of the fact that Mrs. Smith at the time it was contracted had a living husband from whom she had not been divorced; and the children being legitimated were entitled to share in the estate of their father.

In coming to this conclusion we have not overlooked the fact that in some instances it may have the effect of creating conflicting rights between those children who are entirely free from any stain of illegitimacy and those who are so unfortunate as to have been born out of lawful wedlock, or the fact that in some instances it may take from children the inheritance that both unprohibited marriage and birth said should be theirs and give it to those not begotten or born under the full sanctity of the marriage relation; but in adopting this construction we have only endeavored to give to the legislative will the purpose intended to be accomplished. If some disadvantages will follow from the effect of this construction, they are more than overcome by the benefits that will be afforded to those children whose natural father and mother endeavored to save them from the sin committed against them, and upon the whole it will serve to remove any confusion that may now exist as to the rights of children born before the marriage of their father and mother and those children that are the issue of void marriages.

It is also contended that the lower court committed error in holding that Mrs. Meade was not entitled to dower in the land of Meade, but we think this ruling was correct. Three things are essential to the consummation of the widow's right of dower: a valid marriage, seisin of the husband, and his death. Stevens v. Smith, 4 J. J. Mar. 64; Donnelly v. Donnelly, 8 B. Mon. 113. As the

marriage of Meade and Mrs. Smith, at a time when she had another husband living from whom she had not been divorced, was void, it follows that she was not entitled to any dower in Meade's estate, although her children by Meade are legitimate.

Wherefore, the judgment is reversed, with direction to enter judgment in conformity with this opinion.